```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/4/18
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
MARTINE LOWE, :
: **ORDER AND OPINION**
Plaintiff, : **GRANTING DEFENDANTS'**
-against- : **MOTION FOR SUMMARY**
: **JUDGMENT**
MOUNT SINAI HEALTH SYSTEM, INC., :
NICHOLAS LOPIANO (A/K/A NICK : 16 Civ. 6074 (AKH)
LOPIANO), and CAROL TORCHEN, :
:
Defendant. :
:
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiff Martine Lowe brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count I and II), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296 (Count III), the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.* (Count IV), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count V), alleging that her employer and supervisors engaged in unlawful discriminatory and retaliatory practices. In particular, Plaintiff alleges that Defendant created a hostile work environment, unlawfully terminated her employment on the basis of her race, and retaliated against her after she complained about racial discrimination. Defendants moved for summary judgment, *see* Dkt No. 37, and, for reasons set forth below, I grant the motion and give judgment to Defendants.

## FACTUAL BACKGROUND

Plaintiff commenced her employment as a Business Associate ("BA") in the Women and Children's Services department of Defendant Mount Sinai Health System, Inc. ("Mount Sinai") on August 20, 2001. During her employment, Plaintiff was a member of 1199SEIU United Health Workers East (the "Union"). Defendant Nicholas Lopiano became Plaintiff's supervisor

in June of 2010. Defendant Carol Torchen was the Director of Women and Children's Services from 2009 to 2015, and was Lopiano's supervisor.

*Plaintiff's Allegations of Racial Discrimination*

Plaintiff testified in her deposition that Lopiano often made racially charged comments to her like "why don't [you] go back to Haiti" or "You can't even speak proper English." *See* Dkt. No. 43, Ex. I at 76. Lopiano denies making these comments. Plaintiff testified that Torchen made similar comments about her supposed inability to speak English. *Id.* at 196. According to Plaintiff, Lopiano would "make funny faces and make fun with the way I speak with my accent, quite often." *Id.* Such comments, according to Plaintiff, began when Lopiano became Plaintiff's supervisor and "[Lopiano] never stopped saying it until [Plaintiff] got terminated." *Id.* at 131. Plaintiff describes further that Lopiano would, even if only implicitly, signal his disgust for Plaintiff:

> Automatically, [Lopiano] form a character, like, very mad and somebody that upset at me. It could be something very simple I'm talking to him, or I'm asking him about work-related, and he would look at me with a grinch on his face, like I'm disgusting -- or something like something smell -- that's the only way I could describe it, like something smell; when I come to him I'm a bad smell or something; and very funny and embarrass me in front of like, I will feel embarrass. It could be me and another BA talking, if somebody else addressing him he stay as professional as could be. But when I open up my mouth, even in staff meeting, he change automatically. *Id.* at 133–34.

Plaintiff testified that she complained of Lopiano's discriminatory actions to Labor Relations director Clarissa Jones-Winter. *Id.* Defendants dispute that Plaintiff referred to racial discrimination (as opposed to ordinary employee/supervisor friction) in these complaints.

According to Plaintiff, she was variously reprimanded, suspended, and ultimately terminated by Lopiano (see below), motivated by Lopiano's animus toward Plaintiff's race and national origin. Defendants dispute this characterization.

According to Defendants, racial discrimination played no role in their employment decisions. Rather, Plaintiff's tenure was marred by Plaintiff's progressive mistakes, with each

2

failure warranting and receiving appropriate disciplinary action. Defendants describe the following timeline, consisting of three mistakes that ultimately led to Plaintiff's termination.

*Plaintiff's "First Mistake"*

On September 30, 2012, Plaintiff incorrectly registered a new patient by mistaking her for an existing patient. Plaintiff incorrectly mistook "Tiffani D." for "Tiffany D."[1]

On October 22, 2012, Plaintiff received a Final Warning and a Five-Day Suspension because of the September 30 mistake.

*Plaintiff's "Second Mistake" and First Termination*

On January 1, 2013, Plaintiff made a second mistake. Plaintiff switched the first and last name of a patient undergoing a blood test, which resulted in incorrect information being entered into the system and the patient having to obtain a second and unnecessary blood test. The hospital's Sanctions Committee determined that Plaintiff's employment should be terminated after this second error. On January 16, 2013, Plaintiff's employment was terminated.[2]

Following the termination of Plaintiff's employment and the denial of its grievances, the Union, on behalf of Plaintiff, demanded arbitration. A year later, on January 28 and April 9 of 2014, evidentiary hearings were held before Arbitrator Howard Edelman, who issued an arbitration award on May 7, 2014. The arbitrator first ruled that the October 22 Final Warning was an excessive response to the September 30 mistake and that Plaintiff should be reinstated without back-pay. However, on the basis of Plaintiff's second and more serious mistake, which had adversely affected a patient, the arbitrator held that the Plaintiff should be put "on unequivocal and final notice that performance errors of the kind she committed shall subject her to discharge in the future." *See* Dkt. No. 43, Ex. 36 to Ex. I.

---

[1] It appears that this mistake was corrected by Plaintiff shortly after she made it.
[2] The Union filed a grievance on behalf of Plaintiff on January 24, 2013. After a hearing on February 4, 2013, the grievance was denied.

3

*Plaintiff's Reinstatement*

In June of 2014, Plaintiff was reinstated and she returned to work. A few months later, in October of 2014, Plaintiff met with her Union representative, Tyrome Bell, and the Director of Labor Relations, Clarissa Jones-Winter. At the meeting, Plaintiff complained that her supervisor, Lopiano, was scrutinizing her work excessively. Subsequent to this meeting, there were several additional meetings between Plaintiff, Bell, Jones-Winter, Lopiano, and/or Torchen during which Plaintiff made further complaints about Lopiano.

*Plaintiff's "Third Mistake" and Second Termination*

Part of the responsibilities of BA's like Plaintiff is ensuring that patients appropriately fill out admission slips. In May of 2015, after reviewing completed admission slips, Lanise Simmons, Administrative Manager of the Division of Newborn Medicine, noticed that certain necessary insurance information was not being recorded on certain slips. Simmons contacted Lopiano who then sought to identify and correct the problem. Lopiano conducted an audit of the over 500 admission slips from the previous two weeks. The audit showed that twenty slips had missing information, and that Plaintiff was responsible for fifteen of those twenty.[3]

Lopiano consulted with Salvatore LaVecchia, Vice President of Labor Relations, who reviewed Plaintiff's current and past errors. LaVecchia recommended that Plaintiff's employment be terminated, and, on May 19, 2015, Plaintiff's employment was terminated.[4] The Union did not seek arbitration with respect to this second termination.

---

[3] The department had about 22 BA's working at that time, and three BA's besides Plaintiff were responsible for the five other slips with missing information. Two of those BA's were each responsible for one mistaken slip, and one BA was responsible for three mistaken slips. The third BA was verbally reprimanded for these mistakes.

[4] The parties dispute the extent to which Lopiano was involved in the final termination decision. According to Torchen's deposition testimony, the call to "Labor" following Plaintiff's third mistake would have been "initiated" by Lopiano, Plaintiff's direct supervisor. *See* Dkt. No. 43, Ex. K at 52. Various emails indicate that Torchen, Lopiano, and LaVecchia were engaged in discussion about the decision to terminate Plaintiff. For example, in an email from Torchen to LaVecchia, Torchen asks for the "blessing" of human resources. *See* Dkt. No. 50, Ex. T ("Is Nick [Lopiano] terminating Martine Lowe today? . . . I think we all agreed (even Victor) that termination is appropriate. Just need your blessing.").

4

## LEGAL STANDARD

A court should grant summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence in the light most favorable to the party opposing summary judgment ... draw all reasonable inferences in favor of that party, and ... eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). However, the non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

"All of [Plaintiff's] claims, save her claim under the NYCHRL, are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 12 (2d Cir. 2013).[5] "Under the *McDonnell Douglas* framework, [Plaintiff is] required to make out a prima facie case of discrimination by showing: (1) membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and (4) circumstances giving rise to an inference of discrimination on the basis of her membership in that class." *Id.* "Employment discrimination claims brought under section 1981 are generally analyzed under the same

---

[5] "[Plaintiff's] claim under the NYCHRL requires an independent analysis, as the New York statute, amended by the Local Civil Rights Restoration Act of 2005, was intended to provide a remedy reaching beyond those provided by the counterpart federal civil rights laws. To prevail on its motion for summary judgment, the [Defendant is] required to meet its burden of showing that, based on the evidence before the court and drawing all reasonable inferences in [Plaintiff's] favor, no jury could find that the [Defendant] treated [Plaintiff] 'less well' than other employees at least in part because of her race." *Simmons*, 508 F. App'x at 1 (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).

5

evidentiary framework that applies to Title VII and Age Discrimination in Employment Act claims." *Hyunmi Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011).

If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *See McDonnell Douglas*, 411 U.S. at 802–03. "If the defendant bears its burden of production, the presumption drops out of the analysis and the defendant will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (internal citations and quotation marks omitted). To do so, Plaintiff must produce "not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason" for the challenged actions. *Van Zant v. KIM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (internal quotation marks omitted).

"In assessing the inferences that may be drawn from the circumstances surrounding a termination of employment, the court must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted). "[C]aution must be exercised in granting summary judgment where intent is genuinely in issue . . . ." *Id.* at 40. The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context,

6

however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

"A hostile work environment claim requires a showing (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* The Second Circuit has "directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Retaliation claims are also analyzed under the burden shifting framework of *McDoddell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case of retaliation by showing that (1) he was engaged in protected activity; (2) the defendant was aware of the protected activity; (3) he suffered a materially adverse action; and (4) there is a causal connection between his protected activity and the material adverse action. *See Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Jute v. Hamilton Sundstrand Corp.*, 420

F.3d 166, 173 (2d Cir. 2005). Once the employer offers such proof, the burden shifts back to the employee, who "must show that retaliation was a substantial reason for the adverse employment action." *Id.*

## DISCUSSION

### *I.    Summary Judgment is Granted and the Complaint is Dismissed*

Defendants in this case have rebutted Plaintiff's *prima facie* case of race discrimination by articulating a non-discriminatory reason for the adverse employment action. The question is whether Plaintiff has now borne her burden and put forth sufficient evidence to reasonably support a finding that "the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason" for the challenged actions. *Van Zant*, 80 F.3d at 714. She has not.

Defendants had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. By the time of her termination, Plaintiff had made a series of mistakes that reasonably concerned Defendants: Plaintiff was careless in recording patient information in her first and second mistakes and, in her third mistake, Plaintiff again failed to record information important to her employer. Plaintiff's third mistake was identified after Lanise Simmons initiated an audit of the department, seeking to identify and correct why certain necessary insurance information was not being recorded in the admission slips. There is no indication in the record that racial discrimination, or any particular animosity toward Plaintiff, had motivated the initiation of the audit or motivated the ultimate identification of Plaintiff as the primary cause of the mistaken admission slips. Lopiano's assistance in the audit, and his ultimate referral to human resources, was the natural consequence of the audit and Plaintiff's mistakes.[6] This is all

---

[6] Regardless of the extent to which Lopiano was involved in the ultimate termination decision, it is clear that, following an independently initiated audit, Plaintiff was identified to have been responsible for significant and

8

sufficient evidence that the termination of Plaintiff's employment was motivated, not by racial discrimination, but by concern for Plaintiff's ability to adequately perform her job-related duties,

Defendants further point out that the decision of the unbiased arbitrator should be "highly probative" of the absence of discriminatory intent in that termination. *See Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). I agree. "[A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Collins*, 305 F.3d at 119. Here on May 7, 2014, an impartial arbitrator found that Plaintiff's first mistake was "careless" (warranting at least suspension), that her second mistake was even "more problematic," and that both mistakes involved "tasks fundamental to her position." While the arbitration award recognized that Plaintiff was treated harshly with respect to the first mistake, it also recognized that Plaintiff had made progressive errors warranting the arbitrator's "unequivocal and final warning." Plaintiff's third mistake, while not the subjection of arbitration, comes off the heels of the arbitration award's final warning. Plaintiff's inability to properly perform her job-related duties, as evidenced by her third mistake, was the reason Plaintiff's employment was terminated.

Plaintiff argues, however, and testified in her deposition, that Lopiano made consistent and incendiary comments about Plaintiff's race and ability to speak English and otherwise intimated his disgust for her. But, given the above, Plaintiff cannot show a causal connection

---

inexcusable mistakes. Whether Lopiano or LeVecchia made the final call to terminate Plaintiff does not change this fact.

9

between these remarks and the termination of her employment. "[S]tray remarks, without more, and with no nexus to the adverse employment action in this case, would not support" an inference of discrimination. *See Rosenfeld v. Hostos Cmty. Coll.*, No. 10 CIV. 3081 JMF, 2013 WL 1285154, at *5 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 554 F. App'x 72 (2d Cir. 2014). Although Lopiano's remarks should not be considered "stray" or infrequent, crediting Plaintiff's testimony (as I must at summary judgment), there is insufficient support in the record to show a connection between such racial animus and the termination decision. The record shows that the decision to terminate Plaintiff was motivated by legitimate business reasons, following Plaintiff's numerous mistakes, an impartial arbitrator's final warning, and an independent audit.

In a "mixed motive" case a plaintiff can prevail on a Title VII claim by showing that a discriminatory intent was a "motivating" or "substantial" factor in the employer's decision to terminate the employee. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). "[T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's [race] into account." *Id.* The mixed-motive framework articulated in *Price Waterhouse* is codified by statute in the Civil Right Act of 1991.[7]

Plaintiff cannot succeed, even under a mixed-motive framework. "[P]laintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the *de minimis* showing required to establish a prima facie *McDonnell Douglas* case . . . [T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a smoking gun or at least a thick cloud of

---

[7] "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). "On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor . . . ." 42 U.S.C. § 2000e-5(g)(2)(B).

smoke to support his allegations of discriminatory treatment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60–61 (2d Cir. 1997) (internal quotation marks and citations omitted).

Plaintiff has not met her initial burden. The clear cause of Plaintiff's termination was her making significant mistakes after being given a last warning. True, there is controverted evidence of ethnic epithets expressed to Plaintiff, but these did not add to the cause for her termination. *See Price Waterhouse* 490 U.S. at 258. There are no material issues of mixed motive to be tried.[8]

I hold, therefore, that a legitimate, non-discriminatory reason existed for the termination of Plaintiff's employment, and that Plaintiff cannot show that discrimination or retaliation caused her termination. Defendants' motion for summary judgment, dismissing the complaint, is granted. The clerk shall enter judgment for Defendants.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted. The Clerk shall terminate the motion (Dkt. No. 37), grant judgment in Defendants' favor, and mark the case closed.

SO ORDERED.

Dated: May __, 2018
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

---

[8] Plaintiff does not point to satisfactory evidence showing that Lopiano treated or disciplined differently white employees similarly situated to Plaintiff. Nor has Plaintiff pointed to satisfactory evidence that Lopiano did not adequately train Plaintiff in the way he trained other employees. Of the other three employees who made mistakes related to the admission slips, none had disciplinary records similar to Plaintiff and none made nearly as many admission slip errors as Plaintiff. In a department where over fifty percent of BA's were African American or Hispanic, there is little to show that Lopiano treated Plaintiff differently from others. The ultimate fact is that Plaintiff, one employee out of over 20 employees who were mostly minorities, bore the primary responsibility for the admission slip errors. This failure to perform job-related duties was why Plaintiff was terminated.

11